UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICARDO MORALES,<br><br>                           Plaintiff,<br><br>          -against-<br><br>CITY OF NEW YORK, *et al.*,<br><br>                       Defendants. | 18cv1573 (JGK) (DF)<br><br>**MEMORANDUM<br>AND ORDER** |

**DEBRA FREEMAN, United States Magistrate Judge:**

In this civil rights action, which has been referred to this Court by the Honorable

John G. Koeltl, U.S.D.J., for general pretrial supervision, plaintiff Ricardo Morales ("Plaintiff")

brings claims under 42 U.S.C. § 1983 against his former employer, the City of New York (the

"City"), as well as against Mayor Bill De Blasio ("De Blasio" or the "Mayor"), and

Commissioner of the Department of Citywide Administrative Services ("DCAS") Lisette Camilo

("Camilo") (all, collectively, "Defendants"), alleging that Defendants unlawfully terminated his

employment in retaliation for engaging in activity protected by the First and 14th Amendments

to the Constitution.

Currently before the Court are two letter motions filed by Plaintiff seeking to compel the

production of certain documents withheld or redacted by Defendants, and to compel the

depositions of three high-ranking City officials.  (Dkts. 31,[1] 36.) After receiving Defendants'

written response (Dkt. 35) to Plaintiff's initial motion, this Court held a telephone conference

with counsel for all parties on September 6, 2019.  At the conclusion of that conference, this

---

[1] The motion filed at Dkt. 31 requested a discovery conference before Judge Koeltl, and, given that discovery matters are now pending before this Court, Judge Koeltl terminated that motion.  By this Order, this Court addresses the substantive issues first raised in that motion.

Court directed the parties to make supplemental written submissions with additional factual detail and legal support for their respective positions regarding the discovery Plaintiff is seeking. The parties have since filed letters briefing the relevant issues more extensively. (Dkts. 36, 38.) In his most recent letter (Dkt. 36), Plaintiff also requests an extension of the deadline for the close of fact discovery and states that Defendants have consented to the extension. As set forth in greater detail below, Plaintiff's motion to compel unredacted copies of documents withheld or redacted based on the deliberative process privilege (Dkt. 31) is granted as to most of the documents at issue, but Defendants are directed to provide certain documents to this Court for *in camera* review. Plaintiff's motion to compel the depositions of three City officials (Dkt. 36) is granted as to one of the officials, and denied without prejudice as to the other two. The parties' request for an extension of the discovery period (Dkt. 36) is granted.

## BACKGROUND

### A.     Relevant Factual Allegations

Plaintiff alleges that he was unlawfully terminated from his position as DCAS Deputy Commissioner in retaliation for opposing and speaking out against two allegedly unlawful real estate transactions involving City-owned property. In one these transactions, the City leased a restaurant, Water's Edge, located on City-owned property in Long Island City, to Harendra Singh ("Singh"), who Plaintiff alleges is a businessperson who had made contributions to De Blasio's political campaign. (Dkt. 1 ¶¶ 26-27.) The lease was later renewed, apparently on terms favorable to Singh, despite the fact that he was allegedly "in substantial default of his leasehold obligations to NYC." (*Id.* ¶ 28.) Plaintiff's Complaint alleges that Singh later admitted that his political contributions were connected to official actions taken to renew the

Water's Edge lease. (*Id.* ¶ 46.) Plaintiff claims that he was removed from negotiations with Singh in 2015 "because he had refused to provide Singh special treatment." (*Id.* ¶ 31.)

The other transaction involved a non-profit company operating as Rivington House ("Rivington"), which was "commonly known as a nursing home for patients with AIDS." (*Id.* ¶ 48.) The property on which Rivington was located had been encumbered by deed restrictions requiring that it be used to operate a medical residential care facility run by a non-profit. (*Id.*) In 2015, however, the property was sold to a private company, and the deed restrictions were removed later that year. (*Id.* ¶ 51.) In early 2016, the property was then sold to private developers for a large sum. (*Id.* ¶ 52.) According to Plaintiff, the removal of the deed restrictions and the lucrative sale generated a "public outcry." (*Id.*) In response, the City allegedly attempted a "cover-up" involving public meetings and deceptive messaging driven by various City officials and the Mayor's office. (*See id.* ¶¶ 60-63.) Plaintiff claims that he "promptly and more than once objected that the Mayor's office narrative was not true." (*Id.* ¶ 64.)

In February 2017, Plaintiff was terminated, for the official reason that the City "had decided to go in a different direction." (*Id.* ¶ 74-76.) Plaintiff alleges that this reason was pretextual, and that he was in fact terminated, "and publicly humiliated," because of his vocal opposition to the City's dealings with respect to Water's Edge and Rivington, and "in order to send a severe message to all City servants." (*Id.* ¶ 78.)

B.     **Disputed Documents and Depositions**

In his first letter motion, Plaintiff requested unredacted copies of 34 emails that,

according to Plaintiff, Defendants had either withheld or produced with redactions.[2] (Dkt. 31,

at 1.) Initially, Defendants stated that they were withholding or redacting 25 of these emails on

the basis of the "deliberative process" privilege (Dkt. 35-2 ¶ 12), but it is this Court's

understanding that Defendants have since agreed to produce unredacted versions of three of

these emails, leaving 22 of those 25 still in dispute (*see* Dkt. 38, at 2-4). Apparently, Defendants

have withheld or redacted the additional nine emails pursuant to the work-product doctrine or

because the documents are claimed to be protected by the attorney-client privilege. (*See*

Dkt. 38-1.) Plaintiff has challenged Defendants' application of the deliberative process privilege

only (*see* Dkts. 31, 36), and thus this Court will not address documents withheld or redacted on

other grounds.

In addition to seeking to compel the production of documents, Plaintiff has also sought to

compel the depositions of four current and former City officials: (1) Anthony Shorris

("Shorris"), former First Deputy Mayor of New York; (2) Jon Paul Lupo ("Lupo"), former

Director of Intergovernmental Affairs for the Office of the Mayor; (3) Dominic Williams

("Williams"), Chief Policy Advisor for the Office of the Mayor; and (4) Emma Wolfe ("Wolfe"),

Chief of Staff to the Mayor. (Dkt. 31, at 1; Dkt. 35, at 5.) Since the date when Plaintiff first

raised the issue of these depositions, Defendants have agreed to produce Williams for a

deposition of limited scope, but they continue to object to the requested depositions of the three

other individuals, claiming that they are high-ranking government officials (or former officials)

---

[2] It appears that at least some documents were produced with redactions (*see* Dkt. 36, 4-5 (referring to an email that "the City ha[d] redacted . . . entirely"), but it is not clear from any of the parties' submissions whether some were not produced at all (*see* Dkt. 35-2 ¶ 12).

and, as such, are exempt from deposition in civil actions.  (Dkt. 35, at 5-6.)  Plaintiff appears to

concede that these individuals are indeed high-ranking officials who would ordinarily be exempt,

but argues that an exception applies here because they have unique first-hand knowledge of

information relevant to his claims.  (*See* Dkt. 36.)

**DISCUSSION**

I. **DOCUMENTS WITHELD OR REDACTED**
   **BASED ON THE DELIBERATIVE PROCESS PRIVILEGE**

A. **Scope of the Privilege**

The deliberative process privilege protects documents that would reveal a government

agency's internal decision-making regarding official policy and "is designed to promote the

quality of agency decisions by preserving and encouraging candid discussion between officials."

*Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005).  The privilege

does not protect all communications between government officials; it protects only those that are

"predecisional" and "deliberative" in nature.  *Grand Central P'ship, Inc. v. Cuomo*, 166 F.3d

473, 482 (2d Cir. 1999).  In determining whether a document is predecisional, courts look to

whether the agency can "(i) pinpoint the specific agency decision to which the document

correlates, (ii) establish that its author prepared the document for the purpose of assisting the

agency official charged with making the agency decision, and (iii) verify that the document

precedes, in temporal sequence, the decision to which it relates."  *Seife v. U.S. Dep't of State*,

298 F. Supp. 3d 592, 614 (S.D.N.Y. 2018) (internal quotation marks and citation omitted).  In

determining whether a document is deliberative, courts consider whether it "(i) formed an

essential link in a specified consultative process, (ii) reflects the personal opinions of the writer

rather than the policy of the agency, and (iii) if released, would inaccurately reflect or

prematurely disclose the views of the agency." *Id.* (internal quotation marks and alterations omitted) (quoting *Grand Central*, 166 F.3d at 482).

**B.**     **The Particular Context Presented by the Parties' Dispute**

In their most recent letter to the Court, Defendants divide the documents they have withheld or redacted pursuant to the deliberative process privilege into seven groups. (Dkt. 38, at 2-4.) The common theme among these groups of documents is that they all involve deliberations about the City's messaging strategy or its statements to the press or the public, most often about Rivington. (*Id.*) There is no assertion by Defendants that the individuals on the relevant emails were deliberating any official action affecting the Rivington property; indeed, the communications at issue post-date the Rivington sale and related City actions by at least several months. (*See* Dkt. 38-1.) Rather, Defendants have taken the position that these communications are predecisional because, although the substantive decisions regarding the Rivington property had already been made, City officials had not yet made a decision about what to say to reporters and concerned citizens asking about those underlying decisions, and thus the City's "policy" regarding how to respond was non-final and under deliberation. (*See* Dkt. 38, at 1.) According to Defendants, both the City's determination as to how to answer particular questions from the press or the public, as well as its overall strategy for responding to similar inquiries in the future, themselves represent substantive agency decisions within the meaning of the privilege. (*Id.*, at 2.)

Defendants argue that their theory comports with the law of this Circuit, in which courts "have found that the deliberative process privilege applies to agency deliberations about future public statements." (*Id.*, at 1.) Defendants principally rely on four cases to support the proposition that messaging and public-relations strategies, standing alone, effectively qualify as

6

substantive government policies and, when non-final, render communications discussing them "predecisional." (*See* Dkt. 38, at 1-2 (citing *Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515 (S.D.N.Y. 2010) ("*Fox News I*"); *Citizens Union of New York v. Attorney General of New York*, 269 F. Supp. 3d 124 (S.D.N.Y. 2017); *Seife*, 298 F. Supp. 3d 592; *Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261 (S.D.N.Y. 2012) ("*Fox News II*")).) Only one of these cases, however – *Seife* – lends any support to Defendants' characterization of the law; the others directly contradict it.

Defendants cite *Fox News I* because it applied the deliberative process privilege to protect, *inter alia*, emails about a press release, but their characterization of the case (Dkt. 38, at 1) is misleading. In *Fox News II*, the Honorable Frank Maas, U.S.M.J., rejected a similar characterization of his earlier opinion, saying that the government had "ignore[d]" the holdings of *Fox News I*, and that documents regarding "how best to present [the defendant's] position" were not privileged. *Fox News II*, 911 F. Supp. 2d at 276 ("[C]ommunications concerning how to present agency policies to the press or public, although deliberative, typically do not qualify as substantive policy decisions protected by the deliberative process privilege."). Such documents, Judge Maas stated, can be withheld only if "their release would reveal the status of internal agency deliberations on substantive policy matters." *Id.* at 277.

In another case cited by Defendants, *Citizens Union*, the court stated unequivocally that "communications reflect[ing] deliberations about what 'message' should be delivered to the public about an *already-decided* policy decision" are "not protected by the privilege." *Citizens Union*, 269 F. Supp. 3d at 165-66 (emphasis in original) (citing *Fox News II*, 911 F. Supp. 2d at 276). Defendants' citation to the case – for the proposition that discussions regarding a draft public statement about a substantive policy decision could be privileged if they

revealed deliberations about the underlying policy (Dkt. 38, at 2) – accurately characterizes the court's holding, but that holding does not support Defendants' position that messaging deliberations can be privileged even when they do *not* reveal anything about the underpinnings of a substantive policy decision.

In contrast, *Seife*, alone among the cases cited by Defendants, does support this position. In that case, the court acknowledged that other courts in this District have held that deliberations regarding how to present an agency policy to the press or the public are not protected by the deliberative process privilege. *Seife*, 298 F. Supp. 3d at 614-15 (citing cases). Noting that the Second Circuit had not spoken on the issue, however, the court in *Seife* elected to follow the reasoning of courts in the District of the District of Columbia and the First Circuit, and accordingly held that, "[e]ven when an underlying decision or policy has already been established by the agency, the decision of how, and to what extent, to convey that policy to the public may require input by many working components within the agency, or even an analysis of the underlying policy itself." *Id.* at 615-16. Yet, even as the court took the position that these types of "messaging" decisions should not be "categorically exempt[]" from protection, it cautioned that "the burden remains on the [government] to 'furnish the Court with specific information establishing that the [document] is both predecisional and deliberative, by explaining, for example, the function and significance [of the document] in the agency's decisionmaking process.'" *Id.* at 616-17 (quoting *Fox News II*, 911 F. Supp. 2d at 276).

While this Court is dubious that a messaging strategy for the press or the public regarding an earlier-reached agency decision should, itself, be characterized as the type of agency decision that could warrant the application of the deliberative process privilege, this Court need not make that legal determination here, as, even if this Court were to adopt the reasoning of *Seife*,

Defendants' invocation of the privilege here, with respect to such messaging strategies, must be found insufficient.

C.  **Defendants Have Failed To Demonstrate That the Documents Sought by Plaintiff Are Protected by the Deliberative Process Privilege.**

Defendants offer individual explanations as to why each of the seven different categories of withheld or redacted documents are predecisional.  Regarding documents labeled Priv-Redact 0029, 0030, 0031, 0032, 0033, and 0034, Defendants claim that these emails, reflecting preparations for a City hearing, "informed not only the . . . strategy for response to anticipated City Counsel [sic] questions, but also the strategy for the public response to the sale of Rivington House itself."  (Dkt. 38, at 2.)  As the "decision" claimed by Defendants relates purely to public messaging, their argument would fail under the law, as articulated in most of the cases in this District, including *Fox News I*, *Fox News II*, and *Citizens Union*.  Furthermore, even if Defendants could claim that a messaging strategy itself is a policy decision for purposes of the privilege, as *Seife* would allow, they would still have to describe that strategy with specificity and explain the significance of the communications at issue to the agency's decision-making process.  The reference in Defendants' letter to a nebulous City "strategy," which may or may not have been substantively related to the communications in the documents at issue, and may or may not have been a policy seriously under consideration, is insufficient.  *See Seife*, 298 F. Supp. 3d at 620 (holding descriptions of reasons for withholding internal talking points were insufficient when they did not specify "whether they were the talking points actually implemented by [agency] officials in communicating with the press").  Therefore, Defendants are directed to produce these emails.

Next, Defendants describe Priv-Redact 0003 as "emails discussing the press response to incoming reporter questions concerning" an investigation into Rivington, but they do not provide

any more particular rationale for withholding the document.  (Dkt. 38, at 3.)  To the extent

Defendants are suggesting, by their description of the document, that it contains communications

related to a City messaging strategy with respect to Rivington, they have offered even less

specificity regarding both the nature of the strategy and the significance of the communications

to the development of that strategy than they have offered with respect to the documents

addressed above.  Defendants cannot carry their burden of demonstrating that Priv-Redact 0003

is predecisional and deliberative, under any of their cited cases, without at least pointing to *some*

decision – messaging or otherwise – that was under deliberation, and *some* explanation as to how

the communication impacted that decision.  Defendants are therefore directed to produce

Priv-Redact 0003.

  As to Priv-Redact 0006, Defendants claim that this "non-final . . . inter-agency email"

contains deliberations regarding "proposed personnel changes in communications to mitigate the

likelihood of future miscommunication," implicating the "long-term communications policy of

an agency."  (*Id.*)  As with their reference to a City "strategy," above, Defendants' citation to an

undefined body of official "communications policy" – without pointing to any particular policy –

is too vague to justify the application of the deliberative process privilege.  Defendants are

therefore directed to produce Priv-Redact 0006.

  Defendants assert that Priv-Redact 0007, 0008, 0022, 0023, 0024, 0025, 0026, 0027, and

0028 are emails regarding the City's response to press inquiries about allegations of

whistleblower retaliation against a former City employee, and argue that these emails "concern

the fundamental policy decision by an agency head to restructure or remove senior employees to

reorient provision of agency services."  (*Id.*)  As an initial matter, although Defendants do not

specify when this apparent restructuring or removal of a senior employee occurred, the Court

infers that, as the emails concern the allegations of a *former* employee who appears to have been

fired (*id.*), the communications at issue were made after the claimed agency "decision" had been

made.  Deliberations that post-date a government decision cannot be predecisional, *see Seife*,

298 F. Supp. 3d at 618, and thus the deliberative process privilege does not protect these

documents based on Defendants' asserted rationale.  Furthermore, to the extent Defendants are

implicitly arguing that the emails relate to the City's messaging strategy with respect to the

whistleblower's termination (*see id.*, at 3-4 (citing *Seife*'s holding regarding responses to press

inquiries)), this Court reiterates that implied and unexplained connections to undefined agency

"strategies" are not a sufficient basis for withholding discoverable information under the

deliberative process privilege.  Defendants also claim, however, that some of the documents in

this group "include [the] Law Department's privileged impressions of the strength of the former

employee's case."  (*Id.*, at 3.)  As stated above, Plaintiff has not specifically challenged

Defendants' claims of work-product protection or attorney-client privilege, and thus, although

Defendants are directed to produce these documents to the extent they have been withheld or

redacted based on the deliberative process privilege, Defendants may continue to withhold or

redact documents in this category to the extent they constitute work product or are shielded by

the attorney-client privilege.

Regarding Priv-Redact 0016 and 0017, Defendants claim that, in deliberating how to

address press inquiries and a public hearing about Rivington, City officials discussed "how such

coincidences could be better avoided in the future, as a matter of internal policy."  (*Id.*, at 4.)

Defendants also state that "[p]re-decisional press response deliberations often inform an

agency's future practice . . . , particularly if the scenario may recur in the future."  (*Id.*)  The

Court is unconvinced that these discussions – apparently about what had gone wrong with

Rivington – truly represented deliberations of an "internal policy." The Court's skepticism is driven in large part by the especially vague characterization of internal deliberations that "often" inform some purely hypothetical practice that the agency might implement in the future. As this explanation does not adequately identify a specific decision under deliberation, Defendants are directed to produce these documents.

Priv-Redact 0014 is an email to De Blasio from his press secretary discussing "the recommended press response to incoming questions from reporters about the termination of . . . [P]laintiff." (*Id.*) Based on its September 6 conference with counsel, it is this Court's understanding that, by that point, a messaging strategy had been developed, and that De Blasio's press secretary was merely conveying to De Blasio the substance of what had *already been decided* as to what he should say to the press about Plaintiff. Therefore, even if this Court were to adopt the reasoning of the legal authority most favorable to Defendants and hold that a public-messaging strategy could be considered an agency decision, Priv-Redact 0014 would not qualify as predecisional. Accordingly, the privilege does not apply, and Defendants are directed to produce this document.[3]

The final category of documents Defendants have withheld or redacted, containing Priv-Redact 0001 and 0002, is the only one for which they may have a valid claim for protection under the deliberative process privilege. Defendants characterize these emails, dated March 26-27, 2016, as communications discussing, in part, "the Mayor's Office's response to lifting the deed restriction on the [Rivington] property." (*Id.*, at 3.) Defendants then note that,

_____

[3] The Court also notes that, even if the deliberative process privilege could be found to apply, the particular relevance of this document would likely trigger an exception to the privilege. *See Burka v. N.Y.C. Trans. Auth.*, 110 F.R.D. 660, 667 (S.D.N.Y. 1986) (holding that an exception to the deliberative process applies "[w]here the decision-making process itself is the subject of the litigtation").

on March 1, 2016, the Mayor placed all deed-restriction removal applications on hold.  (*Id.*)  The emails in question post-date this decision, and thus could not have involved any predecisional deliberation of it.  Defendants, however, also cite a March 31, 2016 executive order issued by De Blasio requiring public notice of all deed-restriction modifications.  (*Id.*)  Unlike Defendants' arguments regarding the other categories of documents already discussed, Defendants' rationale in this instance thus points to a specific policy decision to which the withheld communications could have been related.  As Defendants' description of the emails is very general, though, the Court cannot say definitively whether they truly involve the deliberation of officials on the substance of what would eventually become an executive order.  Accordingly, Defendants are directed to  provide unredacted copies of Priv-Redact 0001 and 0002 to the Court for *in camera* review, as well as a copy of the executive order cited in their letter.

## II.      THE REQUESTED DEPOSITIONS OF LUPO, SHORRIS, AND WOLFE

### A.      Law Applicable to Depositions of High-Ranking Government Officials

As Defendants correctly observe, the Second Circuit has held that "a high-ranking government official should not – absent exceptional circumstances – be deposed or called to testify regarding the reasons for taking official action."  *Lederman v. N.Y. City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013).  Exceptional circumstances are present when "the official has unique first-hand knowledge related to the litigated claims or [when] the necessary information cannot be obtained through other, less burdensome or intrusive means."  *Id.*  The party seeking to take the depositions in question bears the burden of demonstrating exceptional circumstances.  *Winfield v. City of New York*, No. 15cv05236 (LTS) (KHP), 2018 WL 4350246, at *1 (S.D.N.Y. Sept. 12, 2018).

**B.      At This Time, Plaintiff Has Demonstrated Exceptional
         Circumstances To Justify the Deposition of Lupo, but Not Shorris or Wolfe.**

In his most recent letter motion (Dkt. 36), Plaintiff argues that Lupo, Shorris, and Wolfe each has unique first-hand knowledge of information related to his claims, apparently conceding that these individuals qualify as "high-ranking" officials.  As an initial matter, the Court notes that Plaintiff's arguments are supported primarily by excerpts of electronic communications apparently produced by Defendants, but Plaintiff has not provided the Court with full copies of those communications.  As Defendants have not claimed otherwise, the Court assumes that Plaintiff has accurately quoted the cited portions of the communications.

### 1.      Lupo

Plaintiff argues that Lupo has unique first-hand knowledge related to his claims because, acting as a representative of the Mayor's office, Lupo was aware that the City's official narrative about Rivington was false, sought to enforce adherence to that narrative by other City officials speaking publicly on the matter, and endeavored to suppress any objections or contrary accounts of the Rivington sale, including those voiced by Plaintiff.  (*See* Dkt. 36, at 1-3.)  Plaintiff reasons, further, that Lupo's inside knowledge of the falsity of the City's narrative and the legitimacy of Plaintiff's objections suggests he also has unique "knowledge regarding the validity of the publicly stated justification for [Plaintiff's] termination" (*id.*, at 1) – *i.e.*, that Camilo, alone, decided to terminate Plaintiff as part of a restructuring.

In support of his arguments, Plaintiff points, first, to a May 2016 meeting of senior officials organized by the Mayor's office to prepare for an upcoming hearing on Rivington.  (*Id.*, at 1-2.)  Plaintiff alleges that Lupo, on behalf of the Mayor's office, "[c]ontrol[ed] the meeting" and "proclaimed loudly that City Hall had not been involved in Rivington" and that Plaintiff's agency, DCAS, was solely responsible.  (*Id.*, at 2.)  Plaintiff apparently objected to this narrative,

calling it untrue. (*Id.*) Plaintiff describes Lupo's reaction to Plaintiff's objection as "outraged," with Lupo instructing those present that only Camilo, the Commissioner of the agency that was "solely responsible" for the Rivington controversy, should answer questions on that topic, and that Camilo "should cut anyone off that [sic] tried." (*Id.*)

Defendants do not contest Plaintiff's account of the meeting and, instead, seek to downplay its relevance by arguing that the decision to terminate Plaintiff had already been made on March 7, 2016 (by Camilo), making the events that transpired at a May 2016 meeting irrelevant. (Dkt. 38, at 5.) Attached to Defendants' letter as an exhibit is an email that, according to Defendants, shows that the decision to terminate Plaintiff was made by Camilo on March 7. (Dkt. 38-3.) The email, however, does not actually show this, and instead seems to undermine Defendants' argument. For one thing, Camilo wrote in the email (to Williams) that she was "considering some changes" to agency personnel, including Plaintiff. (*Id.*) This implies that she had not yet made the decision to terminate Plaintiff as of March 7. Furthermore, Camilo told Williams in the email that she "[wouldn't] make a move until [they] touch[ed] base." (*Id.*) This, again, suggests that Camilo had not made a decision, and also hints that Williams, or the Mayor's office in general, had at least some influence over Plaintiff's termination, complicating Defendants' position on the matter. (*See* Dkt. 38, at 5 ("[T]he decision to replace [Plaintiff] was made by . . . Camilo . . . It was not made by Lupo or anyone at City Hall.").)

Based on this Court's review of the email, and on the fact that, in objecting to Lupo's Rivington narrative at the May 2016 meeting, Plaintiff claims that he engaged in protected activity, this Court concludes that the meeting, in general, is relevant to Plaintiff's claims and that Lupo has first-hand knowledge of what transpired there. Furthermore, Plaintiff's allegations that Lupo "[c]ontrol[led] the meeting," that he was the person appointed to speak on behalf of the

Mayor's office, and that he was purportedly describing the events surrounding the Rivington sale to other City officials – implying that the other officials did not themselves have direct knowledge of those events or the Mayor's staff's alleged machinations regarding how to present them to the public – sufficiently demonstrate that Lupo's first-hand knowledge is "unique," at least among those present at the meeting.

In addition to the May 2016 meeting, Plaintiff points to a March 2017 communication, sent after Plaintiff's termination a month earlier, in which a City press secretary asks Lupo, "Did [Camilo] really say [M]orales['s] firing wasn't related to Rivington?," and Lupo responds, "Yes[,] [t]hat's what we were told she had to say for legal reasons." (Dkt. 36, at 2.) This exchange lends additional support to Plaintiff's contention that Lupo had inside knowledge about both Rivington and Plaintiff's termination that other City officials – such as the press secretary in this example – did not have. It further suggests that this knowledge may have included an awareness that Plaintiff's termination was, in fact, related to Rivington, but that officials senior to Camilo had told her that she "had to say" otherwise. Especially viewed in combination with the alleged circumstances of the May 2016 meeting, Lupo's involvement in the apparently high-level discussions on these topics is sufficient to demonstrate that he has unique first-hand knowledge related to Plaintiff's claims, and may therefore be deposed.

## 2. **Shorris**

Plaintiff contends that Shorris was "heavily involved in the decision to terminate [Plaintiff]" and implies that Shorris served as an intermediary between the Mayor and "numerous others at City Hall" on the one hand, and Camilo on the other, in facilitating "City Hall's involvement with, if not direction to, Camilo" regarding that decision. (*See id.*, at 5.) Plaintiff bases this contention largely on Shorris's regular contact with Camilo regarding the termination

and other "critical topics." (*See id.*, at 4-5.) Plaintiff cites to excerpts of Camilo's deposition in which she described having been in "constant communication with [her] boss, [ ] [S]horris" and testified that she and Shorris had been "in discussions for awhile [sic] before the decision [to fire Plaintiff] took place." (*Id.*, at 4.) Plaintiff also asserts, without pointing to specific evidence, that Camilo sent Shorris "weekly reports" on a variety of topics, including "[Plaintiff], Rivington, and Water's Edge." (*Id.*)

Based on the cited evidence, this Court is unpersuaded, for several reasons, that Shorris has unique first-hand knowledge related to Plaintiff's claims. First, while the frequent communication between Camilo and Shorris regarding Plaintiff and other relevant topics may suggest that Shorris was *aware* of the events and internal deliberations leading up to Plaintiff's termination, it does not support the inference, urged by Plaintiff, that Shorris and others in the Mayor's office may have "directed" Camilo to fire Plaintiff. In fact, Camilo's deposition testimony could just as easily support Defendants' contrary narrative that Camilo made the decision herself, and simply kept her superiors apprised of her thinking on the matter. (*See* Dkt. 38, at 6.)

Furthermore, the Court agrees with Defendants (*see id.*) that, although Plaintiff asserts that Shorris "communicated directly with the Mayor" regarding "the decision to terminate [Plaintiff] and the subsequent inconsistent messaging to the public," and then "provided direction to Camilo," he cites no evidence indicating that Shorris ever spoke to the Mayor about Plaintiff, much less that Shorris acted as an intermediary to convey to Camilo any directive from the Mayor, regarding Plaintiff's termination (*see* Dkt. 36, at 5).

Finally, without any evidence of Shorris's communications with the Mayor or the "numerous others" allegedly involved in Plaintiff's termination, Plaintiff's argument is based

solely on Shorris's frequent correspondence with Camilo.  Therefore, any relevant first-hand knowledge Shorris has would not be unique, because Camilo would also have knowledge of anything about which the two communicated.  Especially given that Plaintiff has had the opportunity to depose Camilo, this Court cannot conclude, at least at this point, that exceptional circumstances warrant Shorris's deposition.

Notwithstanding this ruling, however, this Court recognizes that the previously withheld or redacted documents that it is ordering Defendants to produce, as well as Plaintiff's depositions of Williams and Lupo, may reveal evidence that could change the above analysis.  Accordingly, Plaintiff's motion to compel Shorris's deposition is denied without prejudice to renew, should additional evidence be developed during the ongoing discovery process, suggesting that Shorris did, in fact, play a direct role in the decision to terminate Plaintiff.

### 3. <u>Wolfe</u>

Plaintiff argues that Wolfe has "unique personal knowledge regarding Water's Edge[] and the City's dissatisfaction with [Plaintiff's] actions in handling the negotiations with [Singh]." (*Id.*, at 3.)  According to Plaintiff, Wolfe was "heavily involved" in the Water's Edge negotiations and "City Hall was aware that [Plaintiff] considered [Wolfe's] involvement . . . unethical."  (*Id.*, at 4.)  Plaintiff points to an email from February 2015, sent by Wolfe to Shorris and Williams, in which Wolfe discussed the negotiations and seemingly referred to Plaintiff as "the problematic lawyer," whom Wolfe did not want involved with Water's Edge.  (*Id.*)  Plaintiff also cites a March 2016 exchange between Wolfe and De Blasio in which De Blasio refers to "the [R]icardo [M]orales issue."  (*Id.*, at 3.)[4]  Plaintiff asserts that this exchange followed an

---

[4] Plaintiff's letter does not specify the exact date on which this communication took place, but implies that it was on or around March 8, 2016.  (*See id.*, at 3.)

email from Williams to Wolfe, in which Williams asked Wolfe whether any of the DCAS staff members slated for termination, including Plaintiff, "raise[d] alarms/bells."  (*Id.*)

As an initial matter, this Court accepts, solely for purposes of addressing the parties' discovery dispute, that Wolfe was indeed heavily involved in the Water's Edge negotiations and likely wanted to keep Plaintiff out of those negotiations.  The City's alleged misconduct with respect to Water's Edge (and Rivington), however, is relevant to Plaintiff's claims only to the extent that it is connected to his termination, and discovery in this action should not be viewed as an opportunity for Plaintiff to conduct a full investigation into the real estate controversies themselves.  In the February 2015 email cited by Plaintiff (in which he seems to have been described as "the problematic lawyer" (*id.* at 4)), this Court does not see a clear link between Plaintiff's firing and Wolfe's alleged conduct, as the email was sent two years before Plaintiff was terminated.  Additionally, although Wolfe described Plaintiff as "problematic" and perhaps an obstacle in the Water's Edge negotiations, it would require a significant inferential leap to assume, from this, that Wolfe then sought to have Plaintiff terminated.

Wolfe's March 2016 exchange with De Blasio came closer in time to Plaintiff's termination the following year (and closely corresponds to the date on which Defendants claim that Camilo decided to fire Plaintiff), but it is not clearly connected to Water's Edge or any protected activity in which Plaintiff engaged, with respect to that controversy.  (*See id.*, at 3.) Although Plaintiff contends that the conversation followed an email from Williams asking Wolfe whether Plaintiff's impending termination "raise[d] alarms/bells," Wolfe's response to that question is not described, and, more generally, there is no evidence linking the email to Wolfe's subsequent exchange with De Blasio.  (*See id.*)  Without such additional context, this Court

cannot determine that the Mayor's mention of "the [R]icardo [M]orales issue" is a reference to Plaintiff's termination.

Although the Court, at this stage, finds no exceptional circumstances justifying the deposition of Wolfe, it again acknowledges that the emails Defendants will produce shortly, as well as the depositions of Williams and Lupo, may allow Plaintiff to fill in some of the gaps in the cited evidence and demonstrate that such circumstances are present. Therefore, Plaintiff's motion to compel the deposition of Wolfe is also denied without prejudice to renew.

## <u>CONCLUSION</u>

For the reasons stated above, it is hereby ordered as follows:

(1) No later than one week from the date of this Order, Defendants shall produce to Plaintiff unredacted copies of the documents they have labeled Priv-Redact 0003, 0006, 0014, 0016, 0017, 0029, 0030, 0031, 0032, 0033, and 0034;

(2) No later than one week from the date of this Order, Defendants shall produce to Plaintiff unredacted copies of the documents they have labeled Priv-Redact 0007, 0008, 0022, 0023, 0024, 0025, 0026, 0027, and 0028, except that these documents may be withheld or redacted to the extent that they fall within the scope of the work-product doctrine or the attorney-client privilege;

(3) No later than one week from the date of this Order, Defendants shall provide to the Court, for *in camera* review, unredacted copies of the documents they have labeled Priv-Redact 0001 and 0002;

(4) Defendants are directed to produce Lupo for a deposition on a date agreed by counsel and the witness;

(5) To the extent Plaintiff has moved to compel the depositions of Shorris and Wolfe, his motion is denied without prejudice to renew; and

(6) The deadline for the close of fact discovery is hereby extended, *nunc pro tunc*, from September 30, 2019 to February 7, 2020.

In light of this Order, the Clerk of Court is directed to close Dkt. 36 on the Docket of this action.

Dated: New York, New York
         November 21, 2019

SO ORDERED

_Debra Freeman_

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)