**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**RICARDO MORALES,**

                        **Plaintiff,**           **18-cv-1573 (JGK)**

                                                   **MEMORANDUM OPINION AND**

**- against -**                                   **ORDER**

**THE CITY OF NEW YORK, BILL**
**DE BLASIO, AND LISETTE CAMILLO,**

                        **Defendants.**

**JOHN G. KOELTL, District Judge:**

     The plaintiff, Ricardo Morales, has brought this action, pursuant to 42 U.S.C. § 1983 and New York Civil Service Law § 75-b, against the City of New York (the "City"), as well as Bill de Blasio and Lisette Camilo, in their individual and official capacities, as the Mayor of the City and Commissioner of the Department of Citywide Administrative Services ("DCAS"), respectively.  The plaintiff alleges that he was fired and publicly humiliated, in retaliation for First Amendment protected speech and for reporting alleged improper government conduct, while the plaintiff served as the Deputy Commissioner for Asset Management at DCAS.  The defendants have moved for summary judgment.  Because the plaintiff has failed to demonstrate any adverse employment decisions were the result of speech protected by the First Amendment or reporting improper government conduct, the defendants' motion is **granted**.

**I.**

The following facts are taken from the Complaint, declarations and exhibits filed in connection with the motions, and the parties' Local Rule 56.1 statements, and are undisputed unless otherwise noted.

**A.**

The plaintiff has served in several senior level positions in the City government, including being appointed as the Deputy Commissioner of DCAS in charge of the Asset Management in June 2014. Compl. ¶¶ 23-24; Declaration of Donna A. Canfield, ECF No. 64 ("Canfield Decl."), Ex. B, at 29; Declaration of Robert Kraus, ECF No. 82 ("Kraus Decl."), Ex. A, at 14, 29-32. During the relevant period, Asset Management was a division within DCAS that managed City-owned office buildings, court buildings, and commercial real estate and was responsible for the City's leased property portfolio. Defs.' 56.1 Stmt. ¶¶ 5-6; Pl.'s 56.1 Stmt. ¶¶ 5-6; Canfield Decl. Ex. D, at 2. Asset Management was the largest division of DCAS with significant responsibility for capital plans and expense funding. Canfield Decl. Ex. F, at 59. In this role, the plaintiff reported directly to the Commissioner of DCAS. See Canfield Decl. Ex. B, at 29. From June 2014 to December 2015, the plaintiff reported to former Commissioner Stacy Cumberbatch, who was then succeeded by

defendant Commissioner Lisette Camilo. Defs.' 56.1 Stmt. ¶¶ 8, 25; Pl.'s 56.1 Stmt. ¶¶ 8, 25.

Prior to Camilo's being appointed as DCAS Commissioner in January 2016, she previously served in the Mayor's Office of Contract Services ("MCOS"), since 2011. Kraus Decl. Ex. D, at 6, 13-14.  Camilo has testified that she was first approached by Anthony Shorris, First Deputy Mayor at the time, in December 2015 with the opportunity to replace Cumberbatch as Commissioner of DCAS. Canfield Decl. Ex. F, at 9-12. Shorris said that there were concerns about DCAS and that, should Camilo accept the position, a goal should be to "improve" DCAS. Id. at 12. As First Deputy Mayor, Shorris had oversight responsibilities for a set of City agencies under his purview, including DCAS.  Defs.' 56.1 Stmt. ¶¶ 10-11; Pl's. 56.1 Stmt. ¶¶ 10-11; Canfield Ex. E, at 11-14.  Dominic Williams, who served as the First Deputy Mayor's Chief of Staff, and assisted Shorris with oversight of the agencies under Shorris' purview, testified that he, Shorris, and the Mayor discussed DCAS as having deficiencies and being in need of a change in leadership and structure in late 2015. Defs.' 56.1 Stmt. ¶¶ 10-11, 13-15; Pl.'s 56.1 Stmt. ¶¶ 10-11, 13-15; Canfield Decl. Ex. E, at 11-14, 38-40, 81-82, 190-92. Williams testified that his concerns about DCAS included specific concerns about the plaintiff, and the plaintiff's tone and responsiveness.  Canfield Ex. E, at 28-31, 103.  The

3

plaintiff contests the foundation of Williams' belief, by submitting declarations from former DCAS co-workers who state that the plaintiff acted professionally and performed his job adequately.  Pl.'s 56.1 Stmt. ¶ 17; Declaration of David Morris, ECF No. 79 ("Morris Decl."), ¶¶ 3-8, 15-16; Declaration of Shireen Brasse, ECF No. 77 ("Brasse Decl."), ¶¶ 3-10.  Williams testified that his initial concerns with Cumberbatch and the plaintiff began in 2014, when Cumberbatch and the plaintiff refused to supply the Deputy Mayor's Office a list of sites for potential affordable housing or pre-K centers—two important priorities for the Mayor.  Defs.' 56.1 Stmt. ¶ 18; Pl.'s 56.1 Stmt. ¶ 18; Canfield Decl. Ex. E, at 28-29, 103, 196-97.

Following the announcement of Camilo as Cumberbatch's replacement for Commissioner of DCAS, she reported that she began meeting with various City agencies that interact with DCAS, and she met internally with DCAS's teams.  After these meetings, Camilo reported that she determined the majority of complaints concerning DCAS related to its Human Capital, Asset Management, and Fleet Services divisions. See Defs.' Stmt. ¶ 29; Pl.'s 56.1 Stmt. ¶ 29.  Camilo further testified that from the beginning of her interactions with the plaintiff, Camilo found it challenging to get information from the plaintiff about DCAS, that the plaintiff would only give "limited answer[s]" and that she would "stumble upon information." Defs.' 56.1 Stmt. ¶¶ 33-

34; Pl.'s 56.1 Stmt. ¶¶ 33-34; Canfield Decl. Ex. F, at 60-61.
As a result, Camilo believed that Asset Management was a "black
box" for her and that she had difficulty developing trust in the
plaintiff.  Canfield Decl. Ex. F, at 21, 60. The plaintiff has
contested the foundation for Camilo's belief, with declarations
from subordinates who believe that the plaintiff and Asset
Management were responsive to Camilo's requests for information.
See Pl.'s 56.1 Stmt. ¶¶ 33-35; Morris Decl. ¶¶ 3-9; Brasse Decl.
¶¶ 3-10.

        Sometime between February and early March 2016, Camilo
determined that she was interested in replacing the plaintiff,
among a series of structural and leadership changes she
contemplated for DCAS. See Canfield Decl. Ex. F, at 57-58, 64-
65. On March 7, 2016, Camilo sent an e-mail to Williams with
names of DCAS senior officials that she wanted to replace,
including the plaintiff (Deputy Commissioner for Asset
Management), Geneith Turnbull (Deputy Commissioner for Citywide
Procurement), Sally Renfro (Chief of Staff), and Suzanne Lynn
(General Counsel). Canfield Decl. Ex. J.  At the direction of
Shorris, the names were then vetted with the City Law Department
and Mayor's Office. See Defs.' 56.1 Stmt. ¶¶ 40-46; Canfield
Decl. Ex. E, at 125-135.  Camilo and Emily Newman, Camilo's
First Deputy, testified that they began to discuss replacing the
plaintiff during monthly meetings with Shorris, because of

performance issues and reports from Shorris about complaints
from DCAS's "client" agencies.  Canfield Decl. Ex. F, at 88-89;
Kraus Decl. Ex. T, at 15-19, 26-27.

**B.**

During his tenure as Deputy Commissioner in charge of Asset
Management and prior to Camilo's appointment as Commissioner,
the plaintiff participated in two transactions, that became the
subject of inquiries and investigations by the New York City
Council ("City Council"), Office of the New York City
Comptroller ("City Comptroller"), City Department of
Investigation ("DOI"), United States Attorney's Office for the
Southern District of New York ("U.S. Attorney's Office"), and
the Federal Bureau of Investigation ("FBI"): (1) negotiations
for the renewal of a leasehold to Water's Edge, a restaurant in
Long Island City ("Water's Edge Transaction"), and (2) the sale,
lifting of deed restrictions, and subsequent re-sale of a
property known as "Rivington House" ("Rivington House
Transactions").

**1.**

Water's Edge is a restaurant located on City-owned property
in Long Island City, for which Harendra Singh acquired a
leasehold from the City in March 2009. See Defs.' 56.1 Stmt.
¶ 76; Pl.'s 56.1 Stmt. ¶ 76; Canfield Decl. Ex. R, at 1.  The
plaintiff has alleged that Singh was politically-connected and

had donated to the Mayor's campaign. See Defs.' 56.1 Stmt. ¶ 79; Pl.'s 56.1 Stmt. ¶ 79.  In or around July 2014, the plaintiff became the lead for DCAS in its negotiations with Singh concerning the renewal of the lease, rent arrears, and certain needs and improvements under consideration. Defs.' 56.1 Stmt. ¶¶ 77-78, 80; Pl.'s 56.1 Stmt. ¶¶ 77-78, 80; Canfield Decl. Ex. C, at 26-28; Ex. R, at 3.  Williams, the First Deputy Mayor's Chief of Staff, testified that at some point after the plaintiff assumed the role of lead negotiator, Williams became concerned about the tenor, decorum, and productiveness of the negotiations, a "lack of responsiveness" and follow-up by DCAS, and reports that the plaintiff had made threatening or aggressive statements. Kraus Decl. Ex. Y, at 53, 75-78. Williams contacted Cumberbatch to gather more information and express his concerns. Id. at 76-78.  David Morris, a DCAS official who was present at the negotiations, has provided a declaration stating that he personally never observed the plaintiff make threatening comments or act in an aggressive manner to Singh. See Morris Decl. ¶¶ 10-11.

In February 2015, Emma Wolfe, Director of Intergovernmental Affairs for the Mayor, e-mailed Shorris and Williams to say that Singh was a "[l]ongtime friend of the Mayor's" and that Wolfe was "begging . . . that someone senior in DCAS talk to [Singh] rather than the problematic lawyer." Canfield Decl. Ex. S.  In

7

the e-mail thread, Williams noted that "Ricardo is in fact senior" and that they "[d]on't want any sense of interference here." Id.  Williams testified that he and Cumberbatch discussed that there was "relatively narrow latitude" for negotiations, that "the other parties were also [being] particularly aggressive," and that the City "could possibly be liable" on some matters; and, Williams testified that he told Cumberbatch that she would need to think about how to manage the fact that the other parties would likely "feel aggrieved." Canfield Decl. Ex. E, 43-44, 76-77.

The plaintiff has testified that Cumberbatch received a phonecall from the Mayor about the Rivington House Transaction, and that in July 2015 Cumberbatch stopped the plaintiff on his way to meet Singh to tell the plaintiff that the transaction required "special treatment."  Canfield Decl. Ex. B, at 41-42; Kraus Decl. Ex. Z, at 29; Pl.'s 56.1 Stmt. ¶¶ 85-88; Defs.' 56.1 Stmt. ¶¶ 85-88. The plaintiff interpreted this statement from Cumberbatch to mean that the Mayor wanted to give the Water's Edge negotiations "special attention," and the plaintiff believed this to be a violation of the City's conflict of interest rules.  Defs.' 56.1 Stmt. ¶¶ 87-88, 90, 93; Pl.'s 56.1 Stmt. ¶¶ 87-88, 90, 93.  In response, the plaintiff told Cumberbatch that "we'll take care of it in due course of business" and told his staff that the transaction "was to be

8

handled like any other transaction." Canfield Decl. Ex. B, at 38, 71-72; Defs.' 56.1 Stmt. ¶ 89; Pl.'s 56.1. Stmt. ¶ 89.

The parties appear to agree that the meeting in July 2015 between the plaintiff and Singh and his lobbyist, Neil Kwatra, was contentious. See Defs.' 56.1 Stmt. ¶ 94; Pl.'s 56.1 Stmt. ¶ 94. The plaintiff asserts that Singh's lobbyist, Kwatra "scolded" the plaintiff and told the plaintiff that "maybe [he] didn't get the memo from City Hall" and then stormed out of the room. Kraus Decl. Ex. A, at 101-02; Compl. ¶ 35. Shortly thereafter, the plaintiff was removed from the negotiations over Water's Edge, and Cumberbatch conducted the negotiations herself. See Defs.' 56.1 Stmt. ¶ 98; Pl.'s 56.1 Stmt. ¶ 98. The plaintiff has testified that he reported his concerns about potential conflict of interest violations to Cumberbatch, but it is uncontested that he did not report his concerns about the Water's Edge Transaction to DOI, until he was later contacted by DOI in 2016. Defs.' 56.1 Stmt. ¶¶ 100, 103; Pl.'s 56.1 Stmt. ¶¶ 100, 103.

In October 2016, Singh pleaded guilty to Conspiracy to Commit federal bribery, including an admission that he gave donations to elected officials in exchange for efforts to seek more favorable lease renewal terms for his restaurant. See Kraus Decl. Ex. G, at 40. DOI produced a report on the results of its investigation into the Water's Edge Transaction in July 2017,

stating that DOI was notified of the matter by the U.S. Attorney's Office. See Kraus Decl. Ex. E, at 1.

It is uncontested that as a civil servant the plaintiff had an obligation "to report any kind of conflict of interest or corruption." Defs.' 56.1 Stmt. ¶ 104; Pl.'s 56.1 Stmt. ¶ 104. Similarly, it is uncontested that under Mayoral Executive Order No. 16, Section 4(d), every officer or employee of the City has an "affirmative obligation to report directly and without undue delay to the Commissioner [of DOI] or an Inspector General any and all information concerning conduct which they know or should reasonably know to involve corrupt or other criminal activity or conflict of interest," either "by another City officer or employee" or "persons dealing with the City." Defs' 56.1 Stmt. ¶ 105; Pl.'s 56.1 Stmt. ¶ 105. "The knowing failure of any officer or employee to report as required" by the Mayoral Executive Order No. 16 is grounds "for removal from office or employment." Id.

### 2.

Rivington House was a property, owned by the City, that was encumbered by a two-part deed restriction, requiring the building to be run by a not-for-profit and used as a medical residential care facility. See Kraus Decl. Ex. L, at 1, 8.  In 1992, Rivington House was purchased by a not-for-profit organization, known as Village Care, and sometime in October

2014, Village Care notified the City that the Allure Group was a
prospective buyer for the property. Id. at 2, 8.  The Mayor's
campaign has received donations from an executive at the Allure
Group and a lobbyist who assisted with the Rivington House sale
to the Allure Group. Id. at 8 & n.23.

Village Care finalized the sale of Rivington House to the
Allure Group in February 2015 for $28 million. Id. at 2.  The
Allure Group then began to renew efforts to remove the deed
restrictions on the property.  As part of the process for
removing deed restrictions, DCAS prepared a "Land Use
Justification" memorandum, that memorialized DCAS's findings
that the "requirements imposed in the deed are now obsolete" and
that "[t]he removal of the restrictions would allow for [use as
a nursing home] and provide any other operator the flexibility
in reprogramming this large building based on changing needs and
neighborhood character." Id. at 11 & n.38. The plaintiff has
testified that the Land Use Justification memorandum was
prepared by "[his] folks down in Planning," Randy Fong and Paul
Costa. Kraus Decl. Ex. R, at 50.  DCAS was also tasked with
appraising the value of the property to determine the highest
price the property could be sold for on the open market without
its deed restriction. Id. at 52-55. In May 2015, First Deputy
Mayor Shorris was advised that a price of $16.5 million to
remove the Deed Restrictions had been agreed to, based upon

11

DCAS's appraisal of the property. See Kraus Decl. Ex. L, at 3, 8. After a public hearing, MCOS (headed by Camilo at the time) signed a Mayoral Authorization Document, stating that the Mayor authorized DCAS to remove the deed restrictions in June 2015. Id. at 6. In February 2016, after Camilo had been appointed Commissioner of DCAS, the Allure Group sold Rivington House for $116 million to private developers, for a profit of $72 million dollars. Id. at 2.

The plaintiff asserts that the expected $72 million profit for the Allure Group was known within City Hall, and that Camilo, as director of MCOS, was familiar with the lifting of the Rivington House deed restriction. See Defs.' 56.1 Stmt. ¶¶ 53, 58; Pl.'s 56.1 Stmt. ¶¶ 53, 58. There is conflicting evidence regarding Camilo's awareness of the approval for lifting the deed restriction on Rivington House. The defendants note that Camilo was Director of MOCS at the time when MOCS signed the Mayoral Authorization Document, authorizing the lifting of the deed restrictions. Kraus Decl. Ex. L, at 13-14; Ex. J. at 22.

In any event, it is undisputed that shortly after the announcement of the sale of Rivington House by the Allure Group in February 2016, Camilo reported the transaction to DOI, raising concerns of fraud, whereas the plaintiff did not report any concerns about the transaction to DOI, prior to DOI's

12

contacting the plaintiff as part of their investigation. See Canfield Decl. Ex. B, at 117; Defs.' 56.1 Stmt. ¶¶ 57-59; Pl.'s 56.1 Stmt. ¶¶ 57-59.  It is undisputed that Camilo had several meetings with the plaintiff and his team regarding how the Rivington House Transactions were valued by DCAS. See Defs.' 56.1 Stmt. ¶ 65; Pl.'s 56.1 Stmt. ¶ 65.  Camilo testified that she felt she never received comprehensive information and a full accounting from the plaintiff about Rivington House, and she believed that the DCAS team had failed to conduct appropriate due diligence. Canfield Decl. Ex. F, at 38-40, 48-49, 106-10.

Beginning in February 2016, there were a series of meetings, press inquiries, and formal investigations into the lifting of the deed restrictions on Rivington House. See Defs.' 56.1 Stmt. ¶ 68; Pl.'s 56.1 Stmt. ¶ 68.  The City Comptroller and DOI opened official investigations into possible fraud in connection with Rivington House. See Kraus Decl. Exs. K & L. The plaintiff was asked to provide documents and have an initial fact-finding interview with DOI beginning in March, and subsequent interviews in April and May 2016. See Kraus Decl. Ex. A, at 122-23.  The plaintiff testified that, in his different roles in senior City government management, he had experience giving sworn testimony before the City Council, State Assembly, and State Senate, as well as testimony under oath in DOI, U.S. Attorney's Office, and FBI investigations. Id. at 6. The

13

plaintiff has also testified that the U.S. Attorney's Office and FBI also opened an investigation into Rivington House. Id. at 124.  Although the plaintiff testified that he was served with a grand jury subpoena by the U.S. Attorney's Office in May 2016 and met with the U.S. Attorney's Office four or five times, he stated that he never testified before the grand jury. See Cranfield Decl. Ex. C, at 40-41.

On or about May 11, 2016, representatives from the Mayor's Office met with senior executives at DCAS, in preparation for an Executive Budget meeting before two City Council committees on May 13, 2016. See Defs.' 56.1 Stmt. ¶ 70; Pl.'s 56.1 Stmt. ¶ 70. A significant portion of the May 11 meeting was devoted to the topic of how DCAS should address anticipated questions about the Rivington House Transactions. See Defs.' 56.1 Stmt. ¶ 71; Pl.'s 56.1 Stmt. ¶ 71.  It is undisputed that at the meeting Jon Paul Lupo, Director of City Legislative Affairs, set out a narrative that the Mayor's Office "had little or [no involvement] with the lifting of the restrictive covenants on the deed" for Rivington House. Defs.' 56.1 Stmt. ¶ 73; Pl.'s 56.1 Stmt. ¶ 73.  Although there is some disagreement about the tone and nature of the discussion, the parties agree that the plaintiff objected to Lupo's narrative, noting that the Mayor's Office was involved in signing the Mayoral Authorization Document. See Defs.' 56.1 Stmt. ¶ 73; Pl.'s 56.1 Stmt. ¶ 73.  The plaintiff has testified

that he believed Lupo was seeking to force DCAS officials to provide false testimony to the City Council. See Kraus Decl. Ex. A, at 136.  Camilo is reported to have said in response to the discussion that she knew that she would be delivering her testimony under oath. See Kraus Decl. Ex. Z, at 56.  Lupo then instructed Camilo alone to answer any questions regarding the Rivington House Transactions. Defs.' 56.1 Stmt. ¶ 74; Pl.'s 56.1 Stmt. Decl. ¶ 74; Canfield Decl. Ex. Q, at 20-24.

### B.

From the spring of 2016 onward, the plaintiff continued to participate in government fact-finding investigations. The plaintiff has stated that none of his testimony was recorded or transcribed, except for his interview with Carter, Ledyard & Milburn ("Carter, Ledyard"), the law firm retained to conduct an internal investigation into the Rivington House Transactions on behalf of the City. See Kraus Decl. Ex. A, at 8-9, 40. The plaintiff has alleged that he provided testimony adverse to the Mayor; however, the only recorded transcript was the one taken by Carter, Ledyard in June 2016, and the plaintiff stated that he does not remember informing anyone at City Hall or DCAS that he gave such adverse testimony. Kraus Decl. Ex. Z, at 79-81. In the sole recorded interview, with Carter, Ledyard, the plaintiff made few, if any, references to the Mayor.  The plaintiff's only statements in that interview that could be construed as critical

of City Hall include noting that the Deputy Mayor's staff received e-mail communications about Rivington House, providing his account of the May 11 City Council testimony preparation meeting, and stating his opinion that DCAS and City Hall shared blame equally for any mistakes made with the Rivington House Transactions. See Kraus Decl. Ex. R, at 103, 114-23.  In that interview, the plaintiff also reported that in December 2015, Cumberbatch told the plaintiff she "took a bullet for [him]," and that Cumberbatch felt the plaintiff "fooled her or . . . kept something from her." Id. at 103-05, 110.  The plaintiff also admitted "as the Deputy Commissioner in charge of this process [for the Rivington House Transactions]," that he would have done certain things differently "in terms of just having some more due diligence." Id. at 125.

In July 2016, DOI issued a Report on the Rivington House Transactions. The Report noted that while DCAS, MCOS, and the City Law Department each "played a role in lifting the deed restriction," none "conducted an analysis to determine if removing the restriction was in the best interest of the City." Kraus Decl. Ex. L, at 1. The Report found a "lack of accountability" and "significant communication failures between and within City Hall and DCAS." Id.  The Report also detailed numerous process failures specific to DCAS—such as the fact that "language written in the [Land Use] [J]ustification memo DCAS

16

prepared as part of the process to lift the restriction," the same memo that the plaintiff testified his subordinates prepared and that the plaintiff transmitted to the Commissioner, "was taken wholly from a memo written by the lobbyist retained by [Village Care] to get the deed restriction lifted." Id. at 3; Kraus Decl. Ex. R, at 50.

### C.

Sometime in November 2016, after Camilo concluded that the attention to the Rivington House Transactions had sufficiently tapered off, Camilo informed Shorris again that she intended to move forward with her plan to restructure Asset Management and replace the plaintiff and Turnbull. See Canfield Decl. Ex. F, at 72-73, 87-88, 129-30. Camilo had previously spoken with Sally Renfro about Camilo's intention to replace Renfro, and Renfro retired shortly thereafter. Id. at 66-67. Camilo changed her mind about replacing DCAS General Counsel, Susanne Lynn, after finding that Lynn was someone that Camilo could trust and rely upon. See Canfield Decl. Ex. F, at 67; Kraus Decl. Ex. T, at 33. Because Turnbull had an underlying civil service status, Camilo decided not to fire Turnbull, and merely to transfer her out of the position of Deputy Commissioner for Procurement. See Canfield Decl. Ex. F, at 66. However, Camilo reported that she decided to wait to terminate the plaintiff until after the holiday season, and then, after the plaintiff was hospitalized

17

in January, again put off the decision for a few more weeks. Id. at 134-35. Camilo testified that the decision was made to terminate the plaintiff without notice, because of concerns that he would be angry, and if he remained in the organization there might be a threat of leaks and disruptions. Id. at 89-90.

On February 24, 2017, the plaintiff was called into a conference room and notified by Camilo and her First Deputy that his employment was terminated, effective immediately. See Kraus Decl. Ex. A, at 155.  Also on February 24, 2017, Mayor de Blasio testified at the U.S. Attorney's Office, allegedly on matters relating to Rivington House, and the plaintiff believes his termination was coordinated to coincide with the Mayor's testimony. See Defs.' 56.1 Stmt. ¶¶ 113-14; Pl.'s 56.1 Stmt. ¶¶ 106-07, 109-10, 113-14.  Camilo has testified that she was unaware that the Mayor had been scheduled to testify at the U.S. Attorney's Office on that day, which is corroborated by an e-mail thread between her and Williams. See Defs.' 56.1 Stmt. ¶ 115; Pl.'s 56.1 Stmt. ¶ 115.  The following Monday, Camilo convened a meeting with senior Asset Management staff to explain how the division was being reorganized. See Kraus Decl. Ex. D, at 156.

## II.

The standard to be applied to a motion for summary judgment is well-established.  "The court shall grant summary judgment if

18

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Cartrett, 477 U.S. 317, 322-23 (1986).[1]  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  The Court's "duty, in short, is confined at this point to issue-finding," and "does not extend to issue-resolution." Id.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017).  If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

### III.

The plaintiff has brought a claim pursuant to Section 1983 against the City, Mayor de Blasio, and Commissioner Camilo, for the alleged violation of his constitutional rights.  The plaintiff alleges that he was retaliated against for three related episodes that he contends were protected speech pursuant to the First Amendment: (1) refusing to offer favorable terms to a politically-connected donor for the renewal of the lease for Water's Edge, (2) objecting to the narrative presented by a representative of City Hall at an internal meeting in preparation for a City Council meeting concerning the Rivington House Transactions, and (3) providing testimony and documents as

part of City, state, and federal investigations into both the Water's Edge negotiations and the Rivington House Transactions. Compl. ¶¶ 2-7, 26-40, 54-65, 75-79, 86-97.

The defendants have moved for summary judgment on the plaintiff's Section 1983 claims, arguing that the plaintiff's three "speech" acts are not protected by the First Amendment, and that the plaintiff has failed to establish a casual connection between any speech and his termination. In addition, the defendants assert that the plaintiff has failed to establish a policy or custom, sufficient to establish municipal liability for the City, and that Commissioner Camilo and Mayor de Blasio are entitled to qualified immunity.

**A.**

"A plaintiff asserting a First Amendment retaliation claim must establish that: (1) [the plaintiff's] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [the plaintiff]; and (3) there was a causal connection between this adverse action and the protected speech." Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting Cox v. Warwick Valley Center School District, 654 F.3d 267, 272 (2d Cir. 2011)).  Because it is clear that an adverse action was taken against the plaintiff, the only questions are whether the plaintiff engaged in speech or conduct protected by the Frist Amendment and whether the

plaintiff has established sufficient evidence of the necessary causal connection between any First Amendment protected speech and the adverse action against him.

### 1.

Whether an employee's speech was protected by the First Amendment is a question of law to be decided by the Court. Rao v. New York City Health & Hospitals Corp., 905 F. Supp. 1236, 1241 (S.D.N.Y. 1995); see also Gomez v. Pellicone, 986 F. Supp. 220, 229 (S.D.N.Y. 1997).  The Supreme Court has established a two-step inquiry to analyze whether a public employee's speech is entitled to First Amendment protection. Lane v. Franks, 573 U.S. 228, 236-37 (2014).  First, the Court must determine "whether the employee spoke as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) (citing Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., 391 U.S. 563, 568 (1968)). Whether a public employee spoke as a citizen on a matter of public concern in turn encompasses two separate inquiries: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011) (citing Garcetti, 547 U.S. at 420-22). Only if the Court answers both questions in the affirmative does the Court turn to the second step of the Pickering framework to determine: "whether

the relevant government entity had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." Matthews, 779 F.3d at 172; see also Pickering, 391 U.S. at 568.

All three episodes of the plaintiff's speech occurred pursuant to his obligations as an employee, not as a citizen, and thus are not protected by the First Amendment.[2]  Whether an employee spoke as a citizen rather than solely as an employee, depends on the answers to two questions: "(A) did the speech fall outside of the employee's official responsibilities [or duties], and (B) does a civilian analogue exist?" Matthews, 779 F.3d at 173; see also Eyshinskiy v. Kendall, 692 F. App'x 677, 678 (2d Cir. 2017).  "Although the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen, "[t]he critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties." Montero v. City of Yonkers, New York, 890 F.3d at 397-98 (quoting Lane, 573 U.S. at 240). To determine whether speech falls outside an employee's official duties, a court "must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two," as well as "[o]ther contextual factors, such

---

[2]  It is unnecessary to decide whether, as the defendants urge, the plaintiff's complaints concerned personal grievances, rather than matters of public concern.

as whether the complaint was also conveyed to the public." Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012). A public employee's speech is not protected if it is "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties." Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York, 593 F.3d 196, 203 (2d Cir. 2010).  Speech has a "relevant civilian analogue" if it is made through "channels available to citizens generally." Jackler, 658 F.3d at 238. "[A]n indicium that speech by a public employee has a civilian analogue is that the employee's speech was to an 'independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee.'" Id. at 241 (quoting Weintraub, 593 F.3d at 204); Matthews, 779 F.3d at 175.

It is uncontested that as a public employee the plaintiff had a responsibility to report concerns about conflicts of interest and corruption.  It is similarly uncontested that Mayoral Executive Order No. 16, Section 4(d) places an "affirmative obligation" on every officer or employee of the City "to report directly, and without undue delay, to the Commissioner [of DOI] or an Inspector General any and all information concerning conduct which they know or should reasonably know to involve corrupt or other criminal activity or conflict of interest," either by another City officer or

employee or "persons dealing with the City." Pl.'s 56.1 Stmt.
¶ 105; Defs.' 56.1 Stmt. ¶ 105. It is similarly uncontested that
the Plaintiff never initiated a report to DOI about the
Rivington House Transactions and the Water's Edge Transaction,
and only raised his concerns with DOI after DOI approached him
for an interview.[3]

Beyond his obligations under the City law and policy, the
plaintiff's speech directly relates to matters about which he
had oversight and management responsibilities as Deputy
Commissioner for Asset Management. It is uncontested that both
the Rivington House Transactions and the Water's Edge
Transaction involved work within the scope of responsibility for
Asset Management, under the plaintiff's management. As the
Deputy Commissioner for Asset Management, the plaintiff had
obligations to report and raise his concerns about conflicts of
interest with Water's Edge, to provide truthful testimony about
the Rivington House Transactions and associated due diligence,
and to engage in deliberate debate to craft appropriate and
accurate City Council testimony.  His speech related directly to
transactions that he personally oversaw and for which he had
specific knowledge, both as a result of his job
responsibilities.  As such, all three episodes did not involve

---

[3] The plaintiff's allegations that he reported his concerns about the Mayor's
potential conflicts of interest for Water's Edge to Cumberbatch does not
alter the analysis.

the plaintiff's speech as a citizen, but rather involved speech that was "part-and-parcel" of the plaintiff's responsibilities as a senior City official in charge of managing Asset Management.

Moreover, under the civilian analog test, any relevant speech that occurred as part of Commissioner Camilo's internal preparation meeting for City Council testimony or the plaintiff's involvement with the Water's Edge negotiations completely lack civilian analogs. Both were channels open only to senior City government officials and were inextricably linked to the plaintiff's role in DCAS.

The parties disagree over the appropriate level of generality with which to determine whether the plaintiff's participation in the various government investigations had a civilian analog.  The plaintiff argues that, because all civilians have an interest in providing truthful testimony in connection with an investigation into government corruption, there is a civilian analog.  The plaintiff relies on language in the Supreme Court's decision in Lane to suggest that a public employee's speech, when it is provided as part of sworn testimony, is categorically speech as a citizen, even if it relates to the plaintiff's employment responsibilities.  However, the plaintiff's reading of Lane sweeps too broadly.  In Lane, the plaintiff was fired after he testified pursuant to a

subpoena before a grand jury and at two separate trials, concerning a former subordinate's prosecution for mail fraud and theft from a program receiving federal funds.  The Supreme Court held that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes."  Lane, 573 U.S. at 238 (emphasis added).  Because it was undisputed that the plaintiff's ordinary job responsibilities did not involve providing sworn testimony, the Court explicitly did not address "whether truthful sworn testimony would constitute citizen speech under Garcetti when given as part of a public employee's ordinary job duties." Lane, 573 U.S. at 238 & n.4.

By contrast, in this case, the plaintiff has testified that he regularly met and discussed issues with DOI, and provided sworn testimony in the course of DOI, U.S. Attorney, and FBI investigations. Kraus Decl. Ex. A, at 6; Ex. R, at 16-17. Further, although the plaintiff was served with a grand jury subpoena, the plaintiff stated that he was never called to present testimony pursuant to that subpoena. Krause Decl. Ex. R, at 9.  Based on the record, the plaintiff appears only to have participated in closed-door, joint fact-finding investigations. Krause Decl. Z, at 74.  Participation in such internal investigations is different from the compelled, open-court and grand jury testimony in Lane. Moreover, unlike in Lane, the

plaintiff here has stated that providing such testimony was an ordinary part of his responsibilities.[4]

Moreover, while the existence of a "civilian analog" is a factor to be considered as part of the inquiry into whether the public employee's speech was made pursuant to the employee's ordinary employment-related responsibilities, "the critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties." Montero, 890 F.3d at 397-98. See Conte v. Bergeson, 764 F. App'x 25, 28 (2d Cir. 2019) (affirming district court's determination that pharmacist's complaints to the State Board of Pharmacy were part

---

[4] The plaintiff's reliance on Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011), is similarly unpersuasive. In Jackler, the plaintiff, a probationary police officer, filed a report corroborating a civilian complaint against a fellow officer, accusing the fellow officer of using excessive force on a suspect. After Jackler's supervisors pressured him to retract the report and submit a falsified narrative, and Jackler refused, he was not hired as a full-time officer. Id. at 231-32. The Court of Appeals concluded that Jackler had a cognizable First Amendment claim because, when he refused to file a false report, he was speaking as a citizen. Id. at 241-242.  Jackler involved very different circumstances from this case. The panel emphasized that Jackler had been asked to "retract his truthful statements and make statements that were false," and determined that "his refusals to accede to those demands constituted speech activity that was significantly different from the mere filing of his initial Report." Id. at 241.  The court emphasized the repeated attempts by the plaintiff's supervisors to have him file a false report, in violation of New York law. Id.  By contrast here, the plaintiff was never instructed to give false testimony, and he provided statements in connection with his job responsibilities or as required to assist government investigations. Ross v. Breslin, 693 F.2d 301, 307-08 (2d Cir. 2012) (distinguishing Jackler, because plaintiff alleged retaliation for making affirmative statements, not for refusing to make false statements); D'Olimpio v. Crisafi, 462 F. App'x 79 & n.1 (2d Cir. 2012) ("Jackler's reasoning does not extend to this quite different factual context, where the employee engaged in speech mandated by law as a duty of his job").  For the City Hall testimony preparation, the plaintiff claims that Camilo—a defendant in this suit—was instructed to give testimony, that the plaintiff believed to be false.  It is uncontested that at no point was the plaintiff, himself, directed to provide false testimony and the plaintiff did not testify.

of her official employment duties as a supervising pharmacist, and therefore not First Amendment protected speech as a citizen, even if the Board does accept complaints from the public).

Indeed, even in contexts where the plaintiff used a channel for speech that may have been available to citizens, courts have still found that the plaintiff's speech was as an employee, when it relates to the plaintiff's official employment duties. For example, in Waronker v. Hempstead Union Free Sch. Dist., 788 F. App'x 788, 792 (2d Cir. 2019), cert. denied, 140 S. Ct. 2669 (2020), the Second Circuit Court of Appeals affirmed a district court's conclusion that a school superintendent spoke as an employee, rather than as a private citizen, when he publicly accused the school district of corruption. The Court of Appeals noted that addressing concerns about public corruption were part of the superintendent's legal and professional duties as an employee of the school district, and that he "did not bear an obligation as a private citizen to communicate with law enforcement about the School District's corruption and mismanagement." Id. at 793-94.

Similarly, in Weintraub, the Second Circuit Court of Appeals held that when a public school teacher challenged the school administration's decision not to discipline a student in his class, he spoke "pursuant to his official duties because it was part-and-parcel of his concerns about his ability to properly

execute his duties." Weintraub, 593 F.3d at 203. The Weintraub court determined that the teacher's speech was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching. Id. See also De Ritis v. McGarrigle, 861 F.3d 444, 453 (3d Cir. 2017) (former public defender's statements to judges and attorneys while in court was speech made as an employee, not as a citizen); Jones v. Wilson Cty., 723 F. App'x 289, 293 (6th Cir. 2018) (probation officer's testimony during court proceeding was "part of her official job duties" and therefore not citizen speech).

Here, the plaintiff's testimony for the various investigations was a "means to fulfill" and "undertaken in the course of performing" his responsibilities both as a manager within a division under investigation and as an employee with important decision-making responsibility for transactions that were under investigation. Therefore, the plaintiff has failed to establish he engaged in any speech "as a citizen on a matter of public concern." Weintraub, 593 F.3d at 203.

Therefore, the plaintiff has failed to demonstrate that he engaged in any speech protected by the First Amendment.

**2.**

In addition to the plaintiff's failure to demonstrate that any of the three episodes that he alleges involved First Amendment protected speech, the plaintiff has also failed to

proffer sufficient evidence to support the causal nexus between any speech and his termination which is necessary for a prima facie retaliation claim. A plaintiff may establish causation either directly with "tangible proof" of retaliatory animus or "indirectly through a showing that the protected activity was followed closely by the adverse action." Smith v. Cty. of Suffolk, 776 F.3d 114, 118 (2d Cir. 2015) (noting "conclusory assertions of retaliatory motive are insufficient").  The Court of Appeals for the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001). However, if a plaintiff seeks to rely solely on temporal proximity, the protected activity and alleged retaliation must have occurred "very close" in time. Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001). Courts in the Second Circuit have generally found periods greater than two months to be too long to support the inference of causation. See, e.g., Stoddard v. Eastman Kodak Co., 309 F. App'x. 475, 480 (2d Cir. 2009)("[I]n the instant case, where the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory

intent, the causal relationship is not established."); Hollander
v. Am. Cyanamid Co., 895 F.2d 80, 85–86 (2d Cir. 1990) (passage
of three months was too long to suggest a causal relationship
for the plaintiff's First Amendment retaliation claim); Ruhling
v. Tribune Co., No. 04-cv-2430, 2007 WL 28283, at *23 (E.D.N.Y.
Jan. 3, 2007) (collecting cases and noting "a passage of two
months between the protected activity and the adverse employment
action seems to be the dividing line").  Further, "it is
axiomatic that a First Amendment retaliation claim does not
exist where the defendants had no knowledge of the allegedly
protected speech." Skates v. Inc. Vill. of Freeport, 265 F.
Supp. 3d 222, 236 (E.D.N.Y. 2017).

     In this case, the plaintiff has failed to provide a
sufficient factual basis to demonstrate the causal connection
necessary for his claim for any of the three episodes of speech.
First, with respect to any speech made by the plaintiff in
connection with the negotiations for Water's Edge, the plaintiff
has failed to show how statements he made to Cumberbatch in July
2015 relate to Camilo's decision to fire him that was made
initially in March 2016.  The remaining two episodes of speech –
the plaintiff's participation in government investigations and
his complaints as part of City Hall testimony preparation in
spring and summer of 2016 – both occurred after Camilo began
preparing to replace him. Finally, the plaintiff alleges that

his firing was connected to the day the Mayor was interviewed by the U.S. Attorney's Office.  However, the plaintiff has offered nothing more than conclusory allegations to support this claim, and an e-mail thread between Camilo and Williams supports Camilo's sworn testimony that she was unaware of the coincidence.

Moreover, with respect to the plaintiff's claims relating to his participation in investigations, although the plaintiff alleges that he gave testimony adverse to the Mayor, there is no evidence in the record that anyone other than the government investigators knew of the content of the plaintiff's testimony. Krause Ex. Z, at 80.  The plaintiff has stated that none of his testimony was recorded or transcribed, except for his interview with Carter, Ledyard, the law firm retained to conduct an internal investigation into the Rivington House Transactions on behalf of the City. Kraus Decl. Ex. A, at 8-9, 40; Ex. R. This transcript does not show that the plaintiff actually gave testimony adverse to the Mayor; the plaintiff only makes general statements that City Hall was provided with information relating to the Rivington House Transactions.  Krause Decl. Ex. R. Furthermore, it is uncontested that numerous DCAS (and other City government) employees participated in the multi-agency investigations into the Water's Edge Transaction and Rivington

House Transactions, but were not terminated.  Pl.'s 56.1 Stmt. ¶ 103; Defs.' 56.1 Stmt. ¶ 103.

Therefore, the plaintiff has failed to establish the necessary causal nexus to support the plaintiff's initial burden for his claim of First Amendment retaliation.

### 3.

In addition to the plaintiff's failure to establish a prima facie retaliation claim, the defendants have provided sufficient evidence to establish that the plaintiff would have been replaced, even in the absence of any speech.  Courts have understood that "protected speech could not substantially cause an adverse action if the employer would have taken that action in any event." Smith, 776 F.3d at 119; see also Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977)); Pitton v. New York City Dep't of Educ., 148 F. Supp. 3d 217, 231 (E.D.N.Y. 2015). Therefore, summary judgment may be granted for an employer that can demonstrate "by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" Smith, 776 F.3d at 119; Mount Healthy, 429 U.S. at 287.  Once the defendant has provided legitimate, non-retaliatory justifications, "the plaintiff must prove pretext by showing that the adverse action would not have taken place 'but-for' the retaliatory motive." Gonzalez v. City of New York, No.

20-1126-CV, 2021 WL 438894, at *2 (2d Cir. Feb. 9, 2021) (citing
Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019)). In this case,
the evidence shows that the plaintiff would have been replaced,
absent any protected conduct. No reasonable jury could find
otherwise.

The plaintiff was a Deputy Commissioner, tasked with
managing the largest line of service within DCAS's operations.
The defendants have documented that Camilo and City Hall
officials found the plaintiff to be difficult to work with, and
that Asset Management, under the plaintiff's leadership, was a
problem area to be addressed by Camilo.  The plaintiff has
challenged testimony from Williams and Camilo about complaints
from City Hall staff and other City agencies about dealing with
Asset Management on two grounds.  First, the plaintiff has
argued that testimony by Williams and Camilo regarding the
reports from City Hall and other City agency officials about
difficulties working with the plaintiff is inadmissible hearsay.
Second, the plaintiff has argued that, to the extent the
testimony is admissible to show Camilo's beliefs, such beliefs
lack foundation.  To support this argument, the plaintiff has
presented declarations from former DCAS co-workers and
subordinates noting that he was perceived within DCAS as a
"beloved leader."  Kraus Decl. Ex. M; Pl.'s 56.1 Stmt ¶¶ 14-15.
None of these arguments are persuasive.

The testimony about complaints about Asset Management under the plaintiff's management is not being offered for its truth, but rather for the non-hearsay purpose of showing that the defendants "legitimately believed" the plaintiff was difficult to work with and had performance issues. Vahos v. Gen. Motors Corn., No. 06-cv-6783, 2008 WL 2439643, at *4 (E.D.N.Y. June 16, 2008) (investigatory report was admissible to show decision-makers' legitimate beliefs about the plaintiff's conduct); see also Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 65 (2d Cir. 2003) (statements made to an employer about an employee's behavior towards colleagues were not hearsay when admitted to establish whether the employer thought the employee was disabled).

Moreover, regardless of how respected the plaintiff may have been by his subordinates or co-workers, the defendants have demonstrated that the plaintiff's supervisor and interagency City government counterparts had complaints.  The defendant has proffered little evidence to rebut these concerns, nor has he argued that such complaints would be insufficient grounds for his termination.

The plaintiff argues that Camilo's plans in March 2016 were not sufficiently definite, because Newman, Camilo's First Deputy, testified that in November 2016, Camilo was considering retaining Morales with a reduced role and fewer

responsibilities, and that the decision to fire Morals required some consultation with City Hall. Krause Decl. Ex. T, 34-35, 45. However, viewing these remarks in context, Newman testified that she and Camilo had been having monthly conversations with City Hall about replacing Morales, because of performance issues that she personally observed and had been hearing about from Shorris concerning the DCAS's other "client" agencies. Id. at 15-19, 26-27. As such, it was clear that Camilo was proceeding towards replacing or taking some adverse action against Morales from at least March 2016.

The fact that Morales was fired, rather than demoted, does not change the fact that Camilo and City Hall Officials were engaged in discussions about replacing Morales prior to any speech he undertook at the City Council testimony preparation meeting or during the government investigations of the Rivington House and Water's Edge transactions. Clark Cty. Sch. Dist., 532 U.S. at 272 ("Employers . . . proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); see also Hartley v. Rubio, 785 F. Supp. 2d 165, 182 (S.D.N.Y. 2011).

Thus, the defendants have shown that the plaintiff would have been terminated irrespective of the incidents on which he relies. Therefore, the plaintiff's claim that he was retaliated against because of his speech fail because the plaintiff has

failed to show that he engaged in any speech protected by the First Amendment and he has failed to show the necessary causal nexus between any of the incidents on which he relies and any adverse action against him.

**B.**

Tt is unnecessary to reach the merits of the plaintiff's Monell claim against the City, because the plaintiff has failed to establish a First Amendment retaliation claim for which the City could be liable under a Monell theory of liability. Summary judgment should be granted dismissing that claim. See Pitton, 148 F. Supp.3d at 232.

Similarly, because the plaintiff has failed to demonstrate that his constitutional rights were violated by actions of either Commissioner Camilo or Mayor de Blasio, it is unnecessary to reach the argument by the individual defendants that they are entitled to qualified immunity. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). See also Rathbun v. DiLorenzo, 438 F. App'x 48, 51 (2d Cir. 2011).

**VI.**

The defendants have also moved for summary judgment dismissing the plaintiff's claim pursuant to New York Civil Service Law § 75-b. "[I]n order to state a claim under § 75-b, plaintiff must allege the following: (1) an adverse personnel action; (2) disclosure of information to a governmental body (a)

regarding a violation of a law, rule, or regulation that endangers public health or safety, or (b) which she reasonably believes to be true and which she reasonably believes constitutes an improper governmental action; and (3) a causal connection between the disclosure and the adverse personnel action." Burns v. Cook*,* 458 F. Supp. 2d 29, 44 (N.D.N.Y. 2006); see N.Y. Civ. Serv. Law § 75-b(2)(a). For the same reasons that the plaintiff failed to show a causal connection for his Section 1983 claim, the plaintiff has failed to state a claim under Section 75-b. See, e.g., Matter of Tenenbein v. New York City Dept. of Educ.*,* 111 N.Y.S. 3d 844 (App. Div. 2019) (plaintiff's Section 75-b claim fails because the defendants demonstrated an independent basis supporting adverse employment action based on history of poor work performance); Oberson v. City of New York, 648 N.Y.S. 2d 13, 14 (App. Div. 1996) (concluding plaintiff's Section 75-b claim fails as a matter of law because of a "lack of temporal coincidence" and because supervisor had independent basis for dismissal); Roens v. New York City Tr. Auth.*,* 609 N.Y.S. 2d 6 (App. Div. 1994) (holding Section 75-b claim failed on the merits because defendant had "a separate and independent basis for the action taken").

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the

remaining arguments are either moot or without merit. For the reasons explained above, the defendants' motion for summary judgment is **GRANTED**. The Clerk is directed to enter judgment dismissing this case. The Clerk is also directed to close all pending motions[5] and to close this case.


**SO ORDERED.**

Dated:      **New York, New York**
            **March 15, 2021**          _____
                                             **/s/ John G. Koeltl**
                                              **John G. Koeltl**
                                **United States District Judge**

---

[5]  Oral argument is unnecessary in this case because the briefs are sufficiently thorough.